Good morning, Your Honor. Beau Sterling for Appellant, Mr. Valentine. Good morning. I'd like, if I may, begin with the argument in our briefs that the District Court erred in calculating the amount of loss under the guidelines for purposes of sentencing. In particular, the District Court erred in calculating the amount of loss as being in excess of $1 million based on the District Court's reliance on uncharged and acquitted conduct. The problem, what the District Court did in this case, is it counted as, within its amount of loss calculations, all of the checks, the counterfeit checks, that were admitted into evidence at trial, regardless of whether those checks, whether there was a conviction or whether they were even part of the charges. And the main problem with the checks that were relied on is that there was no evidence in the record that Mr. Valentine or his accomplice, Reyes, ever intended to cash any of those checks. Now, the fraudulent check scheme at issue here took place over about a three-month period before Mr. Valentine's arrest. During that period, the testimony was that Mr. Reyes or Mr. Valentine would request the checks online, and then they sort of started to come in the mail. And as a fledgling enterprise, Mr. Valentine and Mr. Reyes tried to cash one or two of these checks unsuccessfully. Then Mr. Valentine was arrested shortly thereafter. Mr. Reyes testified at trial, as did Mr. Valentine, and neither one of them testified that it was the intention of the check-cashing scheme to cash every check that came into them. I would argue that that is a crucial finding that had to be made by the court, and there had to be evidence in the record if you're going to rely on those uncharged and acquitted checks as part of the amount of loss calculation. How many checks are involved that were counted that you think there was no evidence of? Well, setting aside the K&H diversified checks that I'm not really talking about here, we're just talking about the checks that came in the mail. We're talking, I think, about it was five or seven checks altogether. Counts 1, 2, 3, and 4. Counts 1, 2, and 3 there was a conviction on. One of those was a treasury check, and then the other two checks were large checks. The Supreme Court's made clear that the sentencing judge can consider uncharged, even acquitted conduct, haven't they? Oh, absolutely, Your Honor. I'm not disputing that. So why – what's your hook for our taking a look at that? The hook here is really not per se that it's uncharged or acquitted conduct. The hook here is that there's no evidence of intent. And under 2B1.1, you can include intended loss amounts in the loss calculation, but I think you have to look at that requirement of intent seriously and look at the record. Yeah. Is there any evidence that he didn't intend? Well, the evidence that he didn't intend is that those checks came in the mail after he was arrested. Or in the instance of one of the checks, he called to see if the check was good, and he decided not to cash it. Now, if this were an ongoing criminal enterprise where they were – where, for example, it was fraudulent credit cards and they were making charges one after another, you could perhaps infer that the intention was to keep making charges on the cards. But here, this was – I think we could characterize it as an experimental enterprise. He didn't intend to be arrested, did he? I beg your pardon? He didn't intend to be arrested. Of course not, Your Honor. But the point I'm trying to make – Can't you infer that if he hadn't been arrested, he would have kept on cashing checks? Well, he never succeeded in cashing any of the checks, I think, is my point, Your Honor. So if he – I mean, if there was some success to this venture, then we could infer from the record that they would keep going with the success that they had. Do the guidelines require success? Well, they require intent. And if you look at author's discussion section 19 to 2B1.1, it says it's the government's burden to prove actual subjective intent to cause the loss. So we have to look in this case, I'm arguing, of what the government actually tried to prove. And these checks came into the record, but they came as 404B evidence just to prove the scheme. There was never any – Did your client take the stand? Yes, Your Honor. Did your client take the stand? Yes, he did. And he offered an explanation for his activities? He did, Your Honor. And the jury disbelieved him? Absolutely. And the judge who sentenced him was the judge who presided over the trial, I presume? That's true, Your Honor. Okay. And did he testify that he didn't intend to transfer these other checks? He was never asked that specific question. He was – Mr. Valentine came up with an explanation, as the government will say, that Mr. Valentine said that these checks were payment for T-shirt transactions or various other things. But there was no testimony as to whether he intended to cash these checks that came in because Mr. Valentine really had no knowledge of most of these checks because they were received in the mail after the time of his arrest. And I also want to make clear we're talking about a – How did they get in the mail? Oh, they came in the mail from the requests that Mr. Reyes and Mr. Valentine made before. I'm not disputing that, Your Honor. Obviously, the checks – the conduct in requesting the checks is certainly something that Mr. Valentine is responsible for, and we're not disputing that. And it was the same conduct as the checks that he tried to cash? Absolutely, Your Honor. Absolutely. Okay. And I do make an argument in the brief that there's at least an issue as to whether or not the relevant conduct sections of the guidelines apply to the specific section involving the amount of loss. The amount of loss section uses the wording the offense, and, of course, in 1B1.3, says that the relevant conduct guideline section applies throughout the guidelines unless otherwise specified. The author's note says that the use of the offense in the loss amount section is not significant, but we argue otherwise. Unless the Court has any other questions at this time, I'd like to reserve the rest for rebuttal. Do you want to say anything about the perjury issue? I'll rely on the briefs, Your Honor. I think those arguments are fairly clear unless the Court has any questions on that. But we do think the Court should have to make a specific finding of perjury if it's going to rely on the next section. Thank you. Thank you. Good morning. May it please the Court, my name is Gregory Dam on behalf of the United States. At the outset, I'm not really sure that I'm supposed to be here this morning. At about 7.13, I received an e-mail from this Court indicating that this case had been argued and submitted. So I suspect that either my alter ego has already been here and argued the case, or somebody was supremely confident that I would appear. I suspect that it's probably the latter. But in the event that my alter ego didn't do such a good job, I'll take another crack at the argument. I was the prosecutor. E-mail's a wonderful thing. I was the prosecutor that prosecuted this case and probably most familiar with the conduct of Mr. Valentine. I guess if you hadn't shown up, it would have been an unintended loss, huh? Yes. Well, I could have claimed, and actually my wife suggested that to me this morning, that as a result of the e-mail, maybe I just didn't need to appear. But I thought that perhaps on the erring on the side of caution, I should in any event. Mr. Sterling indicated that there was no evidence that Mr. Valentine intended to cash these checks. First of all, for intended loss, evidence to cash is not a requirement. Most of the counts that Mr. Valentine was charged with involved the possession of counterfeit checks, which include the elements of possessing these checks with the intent to deceive or to defraud someone else. Now, how do we know what Mr. Valentine intended? Well, unfortunately for Mr. Valentine, this is not the first time that Mr. Valentine has engaged in this conduct. If we look at his pre-sentence report at paragraph 42, we see evidence of a prior bank fraud conviction back in 1994, wherein it's indicated that the defendant was able to make contact with two Chase Manhattan Bank employees and arrange to have them assist in him stealing two boxes of checks from the bank. These checks were for a legitimate business at the bank. The defendant then schemed with other individuals to pass these checks with an intended loss in excess of $18 million. Additionally, the defendant defrauded two casinos in New Jersey by passing counterfeit checks at the cashier's cage. Paragraph 50 of the pre-sentence report talks about that prior conduct at the casinos and indicates that the defendant entered a casino and presented two checks to the cashier's cage in the amount of $94,300 on deposit. The defendant gambled, using markers against the checks, and then returned to the cashier's cage to find that his balance was $29,800. The defendant received $800 in cash and the cashier's check for the balance of the money. The casino later returned the checks or later learned that the checks were counterfeit, and when the defendant returned the cash to the casino's cashier's check, he was arrested. The prognosis by the probation at that time indicates that the defendant's proclivity for continued criminal activity was guarded, and I'd suggest that that was a very appropriate analysis by the probation department at that time. What we find in this case is, is we have actually three fraudulent schemes that Mr. Valentine was involved in. The first scheme was his actions as a consultant in his dealings with Mr. Hector Castillo and his partners, wherein Mr. Valentine claimed to be a consultant that assists them in setting up a restaurant business. He defrauded Hector Castillo and his partners in a couple of different ways. First, when they asked for their money back, he wrote two checks to them on a $5,000 and one for $700. He then, unbeknownst to Hector Castillo, transferred $15,000 from another account that he was able to access on, that belonged to Mr. Castillo, $5,000 in one transfer, $10,000 in another transfer. He then forged checks on Mr. Castillo's account, the K&H account, to himself, one for $5,000 and one for $10,000, corresponding to the money that he'd unlawfully transferred into the account to cover the checks. So that conduct occurred back in November of 2004 and up through March 9th of 2005. It's only a couple of months later that Mr. Valentine becomes involved in, if you believe his story, he said he was involved in selling T-shirts to Mexico, and that he had a contract for 150 million T-shirts to sell to Mexico, and that he believed these checks were in payment through third parties for these T-shirts that he'd sold to Mexico. Hector Reyes, on the other hand, indicated that there was no correlation between these checks whatsoever and the T-shirt sales. Mr. Reyes said that the T-shirt business never got off the ground. They never sold any T-shirts. They never shipped any T-shirts. They never received payment for any T-shirts. But that this was another fraudulent scheme or another scheme that or business opportunity that he came across, and ---- Was Reyes a co-defendant or ---- He was. He was a co-defendant. And I charged him in the third superseding indictment and subsequently offered him pretrial diversion, which he successfully completed. Mr. Reyes didn't have any prior criminal history, and it appeared to me, after having the opportunity to meet with him and his attorney, that he was influenced by Mr. Valentine and relied upon Mr. Valentine. Okay. Well, what were the checks that were counted as part of the intended loss that were never attempted to be cashed? There were ---- There were, let's see, there was one check for ---- The first check that was not charged was a check for $9,800 written on the account of a Sandra A. Cote, C-O-T-E, for $9,800. Now, I might add, with respect to all of these checks, there was a stipulation entered into between the United States and the defendant, and the stipulation read as follows, and the stipulation is identical for each of these nine checks except for the different banks and payees and dates and that sort of thing. But the stipulation reads as follows, that Exhibit No. 24, which is the first check that Mr. Valentine attempted to cash, was written on the Royal Bank of Canada, dated 5-26 of 2005, drawn on the account of Green Shield Canada, payable to Ruby Wholesale Direct in the amount of $75,000, and it was stipulated that it be admitted into evidence without objection and that at all times pertinent to the third superseding criminal indictment in this case, Green Shield Canada had no business, financial part of the T-shirt? Mr. Valentine, yes. He testified that every check that was out-of-State or a foreign check was part of the T-shirt business. Mr. Reyes, on the other hand, testified that he was specifically referred to the Ruby Did Mr. Valentine? Yes. Yes. These checks were made out to either Ruby Wholesale Direct, Ruby's Wholesale Direct, Hector Reyes, or Lawrence or Lorenzo Valentine. Okay. So the stipulation went on to say that these checks were securities of an organization and that they were counterfeiter-forged and not genuine, and that the Royal Bank of Canada and Green Shield Canada were organizations which operated under the activities of which affected interstate or foreign commerce. All we did is we just took up, took all of the checks that were written over a, about a two-month time period, most before Mr. Valentine's arrest. And the trial court found that what happened is that the scheme was instituted and continued for some time after his arrest. It was instituted before his arrest and continued some time afterwards. And they were all admitted together? Yes. Okay. And the long and the short of this is, is that the trial court, with respect to the perjury, made it quite clear that except for Mr. Valentine's testifying as to his name, he didn't believe anything else. Yes. We've read the brief. With that, it looks like I'm nearly out of time.  And I appreciate the second opportunity to argue this case. Thank you. I will leave it to be submitted additionally on the briefs. Thank you. Thank you. You inquired as to the checks. I provided a table on page 11 and 12 of my opening brief. But to summarize, there were five checks for uncharged misconduct, and there were two checks that were acquitted conduct for a total of seven. And any one of those checks, with the exception of one, if not allowed by this court, would take Mr. Valentine below the $1 million threshold and result in a two-point reduction under the guidelines, which would save him approximately a year to 15 months based on the way the court, district court, calculated the sentence the first time around. Just a couple of points I'd like to make, if I may. I do want to point out that the substantive crime charge, and I'm just talking about the Rubies Wholesale Direct Check cashing scheme, not the G&H stuff. But under 18 U.S. Code 513A, it's not merely a possession crime. It's a possession with intent to defraud, as the Court's aware. Yes. The checks that represented uncharged conduct and the acquitted checks, if I can use that shorthand. Yes. All of this was laid out in the pre-sentence report? No, it wasn't, Your Honor. One thing I would note in the pre-sentence report is that the pre-sentence report does not attempt to make any finding with regard to intent with each of these checks. But I mentioned it all. No, no, no. It is mentioned. What's mentioned in the PSI, Your Honor, is that there were a total of whatever it was, 14 checks or transactions admitted into evidence, and that the amount of loss is based on all of those. But if you go through the factual statements in the PSI, it does not attempt to lay out the factual circumstances for each of those uncharged. But you were and your client were on notice that they – that the probation office was suggesting to the Court that they be counted. Absolutely, Your Honor. And there was an objection. Did you object to that? Yes. We filed an objection. Well, I wasn't in the case then, but the trial counsel filed objections to the PSI specifically attacking the amount of loss. The last point I'd like to make in the few seconds I have left is that we're not saying that you can't use uncharged or acquitted conduct in any case. What we're saying here is that the government needs to prove an intent with regard to each of those checks for the loss, and that what we really have here is just a preparation for fraud. We don't have intent and the other elements which we say are required. Unless you have any other questions, then I'll rest. Thank you, Your Honor. Thank you. The case just argued is submitted for decision.
judges: Schroeder, Canby, Hawkins